[660 NYS2d 556]

Pamela A. Draper, Respondent, v Georgia Properties, Inc., Appellant.

First Department, June 19, 1997

APPEARANCES OF COUNSEL

*Anthony J. Cornicello* of counsel *(Peter A. Schwartz* and *Susan R. Baumel* on the brief; *Fromme Fromme Schwartz & Cornicello, L. L. P.,* attorneys), for respondent.

*Jeffrey R. Metz* of counsel *(Paul N. Gruber* on the brief; *Borah, Goldstein, Altschuler & Schwartz, P. C.,* attorneys), for appellant.

## OPINION OF THE COURT

TOM, J.

Defendant Georgia Properties, Inc. is the owner and landlord (the Landlord) of an apartment building designated as 275 Central Park West, New York, New York. On or about April 15, 1991, plaintiff Pamela Draper entered into a lease agreement (the Lease) with the Landlord for Apartment 13-D (the Apartment). Immediately prior to the Lease, the Apartment was subject to the Rent Stabilization Law, and the registered rent was $739.18 per month. The Lease provided for a two-year term commencing June 1, 1991 and terminating on May 31, 1993, and called for an initial monthly rent of $2,700, an increase of 226% of the prior stabilized rent. On or about June 4, 1993, the parties entered into a two-year renewal lease (the Renewal), which provided for a monthly rent of $2,835 per month.

Plaintiff commenced this action on or about April 6, 1995, asserting four causes of action, which sought, respectively: $87,456 in rent overcharges for the period commencing June 1, 1991 through March 1995; treble damages for defendant's alleged willful overcharge; the return of, and treble damages based on, the excess security deposit; and attorney's fees.

The crux of plaintiff's argument is that she was forced by the Landlord to enter into the Lease as a nonprimary resident in order to justify the Landlord's unlawful rent increase. Ms. Draper alleges that she was advised by the Landlord that in order to be granted a lease, she had to sign the Lease and the Rider in the form presented to her, which provided that the subject apartment is a "Non-Primary Residence". Plaintiff has maintained the Apartment as her primary residence since July 1991.

The Landlord does not deny it prepared and drafted the Lease, the Rider, or the Lease Renewal. However, it claims

that plaintiff informed its officer that the premises would not be occupied by her as a primary residence, and that the rent of $2,700 was established based upon that representation.

Plaintiff moved, *inter alia*, for summary judgment on her complaint, as well as an order dismissing defendant's affirmative defenses and counterclaims. The IAS Court, in a decision rendered February 7, 1996, granted the plaintiff's motion including treble damages and held, *inter alia*, that a hearing was not required since the tenant had submitted sufficient proof to show that she maintained the Apartment as her primary residence and that the Landlord engaged in an illegal scheme to reduce the availability of rent-stabilized apartments. The Landlord appeals and we affirm.

The Rent Stabilization Law of 1969 ([RSL] Administrative Code of City of NY § 26-501 *et seq.)* governs the regulation of rents for eligible housing units within the City of New York. It was originally enacted in response to a critical housing shortage following the Second World War (*Rent Stabilization Assn. v Higgins*, 83 NY2d 156, 164-165, *cert denied* 512 US 1213). The law was designed to encourage future housing construction by allowing owners reasonable rent increases, to prevent the exaction of "unjust, unreasonable and oppressive rents" and to "forestall profiteering, speculation and other disruptive practices" in the housing market (Administrative Code § 26-501; *Matter of 300 W. 49th St. Assocs. v New York State Div. of Hous. & Community Renewal*, 212 AD2d 250, 254). "The central, underlying purpose of the RSL is to ameliorate the dislocations and risk of widespread lack of suitable dwellings" (*Manocherian v Lenox Hill Hosp.*, 84 NY2d 385, 395-396, *cert denied* 514 US 1109).

In keeping with these ends, Rent Stabilization Code ([RSC] 9 NYCRR) § 2520.13, promulgated as the result of the RSL, states, in pertinent part: "An agreement by the tenant to waive the benefit of any provision of the RSL or this Code is void" (*see also, Estro Chem. Co. v Falk*, 303 NY 83, 87 [the "obtaining of excessive rents" by a landlord "strikes at the very purpose" of the rent law]; *Cvetichanin v Trapezoid Land Co.*, 180 AD2d 503, 504, *lv dismissed* 79 NY2d 933 ["any purported waiver of rent stabilization rights in a settlement agreement is invalid as a matter of public policy"]).

Moreover, RSC § 2525.3 (b) expressly, and unequivocally, prohibits the utilization of nonprimary residence clauses to circumvent the provisions of the RSL. That section provides: "No owner or other person shall require a tenant, prospective

tenant or a prospective permanent tenant to represent or agree as a condition of renting a housing accommodation that the housing accommodation shall not be used as the tenant's or prospective tenant's primary residence, or the prospective permanent tenant's principal residence." (See also, *Urban Assocs. v Hettinger*, 177 AD2d 439, *lv denied* 79 NY2d 759 [where this Court held that landlord and tenant could not, by private agreement, deregulate an apartment as such an agreement would violate the provisions of RSC § 2525.3 (b)].)

In the case at bar, the Lease and the Rider are in violation of RSC § 2520.13, since they require the tenant to waive a benefit of the RSL; and are in further violation of RSC § 2525.3 (b) since they require plaintiff to enter into a lease on the condition that it be rented as a nonprimary residence, thereby rendering them void *ab initio* and unenforceable. The Landlord's Lease agreement to deregulate the Apartment contravenes the RSL's purpose of providing affordable housing to city dwellers by removing from the market an existing stabilized apartment, which act is prohibited by the law.

Further, the evidence overwhelmingly supports plaintiff's contention that she was required to sign the Lease as a nonprimary resident in order to obtain the Apartment. This was substantiated by the affirmation of Richard Zalk, an attorney who represented plaintiff in a matrimonial action during the time the Lease was executed. Annexed to Mr. Zalk's affirmation is a letter from the Landlord's rental agent, Rita Citrin, to Mr. Zalk, in which Ms. Citrin states: "A condition of this lease is that [Ms. Draper] maintain it as a non-primary residence, which is explained in the rider." The Landlord does not endeavor to explain this letter. Plaintiff avers that she was compelled by the Landlord to list in the Apartment application her then-present address as 19 Nile Drive, Woodstock, New York, which is the home of her parents, instead of her actual address at the time, which was on 89th Street in Manhattan. At that time, plaintiff was employed by Mark Goodson Productions, 375 Park Avenue, New York, New York, where she worked as a production assistant for five years; and her bank account was at the Park Avenue branch of the Bank of New York in Manhattan.

The Landlord maintains that plaintiff at no time informed it that she was using the Apartment as a primary residence, and that it was entitled to pretrial discovery on that issue. However, plaintiff has submitted voluminous documentation to clearly show that she has continuously resided in the Apart-

ment as her primary, and only residence since the inception of the Lease. These documents include her Federal and State income tax returns for the years in issue, bank statements, utility bills, driver's license, voter registration records, correspondence from the Landlord, evidence of participation in community groups, and documentation indicating that her son, Trevor, was enrolled in kindergarten in a private school on East 76th Street. The Landlord cannot deny knowledge of plaintiff's continuous occupancy of this Apartment for four years and submits no evidence to the contrary.

In light of the fact that the Lease and Rider are unenforceable pursuant to the provisions of the RSC, and that the Landlord was aware that plaintiff and her son occupied the Apartment as their primary residence, it is liable to plaintiff for rent overcharges together with interest and attorney's fees.

The dissent relies on our rulings in *Blum v Graceton Estates* (228 AD2d 274, *lv denied* 88 NY2d 815) and *Kent v Bedford Apts. Co.* (— AD2d —, 1997 NY Slip Op 02099 [1st Dept, Mar. 11, 1997]), which are clearly distinguishable from the factual situation in this case. The parties in both *Blum* and *Kent* entered into a stipulation before the Court in settlement of a pending holdover proceeding. In both cases, the landlord had a right to possession, and the "tenants" actually were holdover occupants who, by virtue of the stipulation, secured lease rights which they otherwise would not have had. The agreements were entered into under supervision of the Court and, in *Kent*, the stipulation was so ordered by the Judge (*see*, RSC § 2520.13). Under these circumstances, RSC § 2525.3 (b), which prohibits a landlord from "requir[ing]" a tenant to agree that the housing accommodation shall not be used as a primary residence, has no application. In neither case did the landlord, at the outset, "require" such a provision.

In sharp contrast, the Landlord herein sought, by private agreement, to require as a condition of the Lease that the subject premises shall be maintained as a nonprimary residence thereby illegally deregulating a stabilized housing unit; this clearly violates RSC § 2525.3 (b).

We further agree with the IAS Court determination to award plaintiff treble damages. Administrative Code § 26-516 (a) provides, in pertinent part, that: "any owner of housing accommodations who, upon complaint of a tenant * * * is found by the state division of housing and community renewal, after a reasonable opportunity to be heard, to have collected an overcharge above the rent authorized for a housing accommodation

subject to this chapter shall be liable to the tenant for a penalty equal to three times the amount of such overcharge * * *. If the owner establishes by a preponderance of the evidence that the overcharge was not willful, the state division of housing and community renewal shall establish the penalty as the amount of the overcharge plus interest."

Thus, the foregoing provision creates a presumption of willfulness in rent overcharge cases that the owner/landlord must rebut by a preponderance of the evidence (*Smitten v 56 MacDougal St. Co.*, 167 AD2d 205, 206). In the case at bar, the only evidence submitted to rebut a finding of willfulness was the unlawful nonresidence clause in the Lease Rider, which the Landlord drafted and forwarded. The Landlord's failure to deny that it drafted and presented to the Tenant a lease that contained an illegal provision, clearly proscribed by law, whose purpose was to evade the Rent Stabilization Law and to illegally remove a rent-stabilized apartment from rent regulation, is evidence of willfulness. As a result, we agree with the IAS Court's determination as to treble damages.

In addition, we perceive no error in the IAS Court's determination of the amount of the overcharge, as plaintiff submitted the certified copies of rent records for the Apartment going back to 1984, which established that the last legal registered rent for the Apartment prior to plaintiff's tenancy was $739.18. The Landlord did not submit evidence of more recent registration statements setting forth a subsequent rent and, accordingly, the IAS Court properly determined the legal rent at $739.18.

Lastly, the Landlord's contention that its affirmative defenses and counterclaims should be reinstated is without merit insofar as the Landlord's assertions of unclean hands, equitable estoppel and fraudulent inducement are based upon a void provision of the Lease.

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Emily Jane Goodman, J.), entered on April 9, 1996, which, *inter alia*, granted plaintiff's motion for summary judgment, dismissed defendant's counterclaims, determined the amount of rent overcharge, and awarded plaintiff $208,031 plus attorney's fees in an amount to be determined at a hearing, should be affirmed, without costs.

ANDRIAS, J. (dissenting). I would reverse.

In this action seeking to recover rent overcharges on a rent-stabilized apartment on Central Park West, where the defen-

dant landlord has raised affirmative defenses and counter-claims based upon the claim that the subject apartment was not plaintiff's primary residence, summary judgment should not have been granted without affording defendant the opportunity to conduct its previously demanded discovery on the issue, which in many respects is peculiarly within plaintiff's knowledge (CPLR 3212 [f]; *see generally, Cox v J.D. Realty Associates.*, 217 AD2d 179).

First, it should be noted that plaintiff's motion for summary judgment was made 10 days after the date of defendant's discovery notices, which were served with its answer. Second, the selective documentation offered by plaintiff does not, in my opinion, constitute such "clear evidence", as found by the IAS Court, of primary residency or "clearly show", as stated by the majority, that plaintiff "has continuously resided in the Apartment as her primary and only residence since the inception of the Lease" in 1991.

Nothing in this documentary evidence negates plaintiff's own statements in her 1991 lease application and rider, when represented by an attorney who "provided her with assistance" and "received" the proposed lease for his "review", that her primary residence was at her parents' home in Woodstock, that her present New York City apartment was at 105 West 89th Street and that the Central Park West apartment was to be a nonprimary residence.

This Court recently affirmed the dismissal of two rent-stabilized tenants' actions for rent overcharges based upon the fact that they had previously entered into stipulations of settlement whereby they became rent-stabilized tenants, albeit at higher than rent-stabilized rents (*Blum v Graceton Estates*, 228 AD2d 274; *Kent v Bedford Apts. Co.*, — AD2d —, 1997 NY Slip Op 02099 [1st Dept, Mar. 11, 1997]). The rationale in those cases was that the tenants had the option of foregoing the stipulations and taking their chances on getting a rent-stabilized lease in court or signing the stipulation to their "advantage". In *Kent (supra*, at —), despite the prohibition in Rent Stabilization Code ([RSC] 9 NYCRR) § 2520.13, relied upon by the majority, this Court perceived "no public policy or other reason for disregarding that choice, made with advice of counsel". It also stated that inasmuch as "plaintiff had not yet been established as a rent-stabilized tenant at the time she entered into the stipulation, [she] thus cannot rely on that provision" *(supra*, at —).

Such holding, that at the time of her stipulation the then holdover tenant had not attained the status of a rent-stabilized tenant entitled to the benefits or protections of the Code, would seem to accord with RSC § 2520.11 which provides, in pertinent part, that the RSC "shall apply to [regulated] housing accommodations * * * for so long as they maintain the status indicated below * * * (k) housing accommodations which are not occupied by the tenant, not including subtenants or occupants, as his or her primary residence as determined by a court of competent jurisdiction".

In support of her claim of willfulness, plaintiff calls our attention to two cases involving tenants in her building where the landlord, prior to entering into nonprimary leases with the prospective tenants, commenced declaratory judgment actions seeking to declare the apartments exempt from rent stabilization during the terms of those prospective tenants. Such tenants then signed consent judgments which were thereafter entered by the court; thus, the tenants obtained non-rent-stabilized leases with no right of renewal except on terms agreed to by the parties and exempt from rent stabilization.

While the parties here entered into the lease without benefit of such a prior court determination, I cannot see a practical difference between those cases and the present one except that here the landlord and the tenant lived happily pursuant to the terms of their agreement for four years through two leases and it was only when it was time to renew the lease for a second time and the four-year Statute of Limitations (measured from the date of the first alleged overcharge [RSC § 2526.1 (a) (2)]) was about to expire and plaintiff had accrued over $200,000 in alleged rent overcharges (including treble damages for two years) that plaintiff cried foul. The result, as it presently stands, is that plaintiff gets a rent-stabilized apartment plus a $200,000 bonus for entering into her original lease, while represented by counsel, on her clear statement that this was not to be her primary residence. At the very least, it can be reasonably argued that the apartment may not have been her primary residence for the first or even second year of her original lease, but became such after her son began school.

The prohibition in RSC § 2525.3 (b) merely provides that "[n]o owner or other person *shall require* a tenant, prospective tenant or a prospective permanent tenant to represent or agree *as a condition* of renting a housing accommodation that the housing accommodation shall not be used as the tenant's or prospective tenant's primary residence" (emphasis added).

That, in and of itself, does not seem to prevent the insertion of such a provision in a lease where the inclusion of such language was suggested by the prospective tenant; the majority's reliance upon the rental agent's memorandum regarding " '[a] condition of this lease' " and its statement that "[t]he Landlord does not endeavor to explain this letter" is not dispositive of the issue. That memorandum was submitted as an exhibit to plaintiff's *reply* affidavit and, when read in context,* does not definitely support the claim that the landlord "required" the nonprimary residence clause as a condition of the lease.

For instance, what is to be done if a hypothetical Hollywood producer approaches the landlord of a rent-stabilized building overlooking Central Park and says that she needs a pied-a-terre in Manhattan; that her primary residence is in California; that she likes the building or apartment; and that money is no object.

The present, apparently officially sanctioned procedure, as reflected in this record, is for the landlord to obtain what is, in essence, an advisory opinion that it is all right to give the producer a non-rent-stabilized lease by having the court enter a consent judgment based upon the parties' agreement that the apartment is not to be the producer's primary residence. Here, defendant landlord argues that the only difference is that, rather than obtaining prior court approval for the lease, it is seeking a court determination that the apartment was not going to be plaintiff's primary residence *after* the issue of the validity of their 1991 lease agreement was raised for the first time by plaintiff's 1995 rent overcharge claim. Prior to 1995, the landlord, if what it says about plaintiff's representations at the time is borne out, would have had no reason to question the issue of plaintiff's primary residence. Primary residence issues are generally raised by landlords only when they discover that tenants who are paying lower rent-stabilized rents do not occupy the apartment as their primary residences.

If the present lease violates public policy, even if defendant is able to prove that plaintiff voluntarily and truthfully made her 1991 representations of nonpermanent residency, it would seem that consent judgments entered by a court on identical representations would also violate public policy. However, as previously noted in *Kent* (*supra*), no public policy issue was

---

* It begins: "Per Pamela's request, attached is a copy of the lease she would like to sign for a new apartment. I assume she would like you to review it."

found and it appears that nowhere do the statutes in question dictate whether an owner may choose to rent or not to rent to primary or nonprimary tenants, as the case may be.

The claim of duress raised by plaintiff was also raised in *Kent* (*supra*), where the IAS Court (Ramos, J.) rejected it, stating: "She has failed to explain why she did nothing those seven years. A party who executes a contract for any considerable length of time ratifies the contract (*see, Sheindlin v Sheindlin*, 88 AD2d 930). Even if she could show duress, her delay resulted in ratification." The same can be said here, where, even if plaintiff (who was represented by counsel) felt coerced into signing the first lease because of the prospect of not getting the apartment, the same could not be said two years later when she signed the identical renewal lease.

Therefore, since the public policy issue is unclear on the present record and there is a factual dispute as to whether plaintiff willingly entered into the nonprimary residence lease, summary judgment should be denied subject to renewal after the completion of discovery. Moreover, inasmuch as defendant landlord questions the construction or validity of RSC § 2525.3 (b), the IAS Court may, at any stage, certify such fact to the Division of Housing and Community Renewal, the agency charged with the responsibility for administering the Code, which may intervene in any such action or proceeding (Emergency Tenant Protection Act of 1974 [L 1974, ch 576, § 4] § 12 [a] [7], as added by L 1983, ch 403, § 4). Given the seemingly uncertain state of the law on the subject, such certification should be made in this action.

MILONAS, J. P., and WILLIAMS, J., concur with TOM, J.; WALLACH and ANDRIAS, JJ., dissent in a separate opinion by ANDRIAS, J.

Order and judgment (one paper), Supreme Court, New York County, entered April 9, 1996, affirmed, without costs and disbursements.